# United States Court of Appeals for the Federal Circuit

05-1242, -1243

LAWRENCE I. WECHSLER,

Plaintiff-Cross Appellant,

v.

MACKE INTERNATIONAL TRADE, INC.,

Defendant-Appellant,

and

ANTHONY O'ROURKE,

Defendant-Appellant.

Robert E. Wechsler, Wechsler & Wechsler, P.C., of Great Neck, New York, argued for plaintiff-cross appellant.

Neil A. Smith, Sheppard Mullin Richter & Hampton LLP, of San Francisco, California, argued for defendants-appellants. With him on the brief for Anthony O'Rourke was Darren M. Franklin, of Los Angeles, California. On the brief for Macke International Trade, Inc., was Richard S. Luskin, of Malibu, California.

Appealed from: United States District Court for the Central District of California

Judge Christina A. Snyder

# United States Court of Appeals for the Federal Circuit

05-1242, -1243

LAWRENCE I. WECHSLER,

Plaintiff-Cross Appellant,

v.

MACKE INTERNATIONAL TRADE, INC.,

Defendant-Appellant,

and

ANTHONY O'ROURKE,

Defendant-Appellant.

_____

DECIDED:  May 18, 2007

_____

Before MAYER, GAJARSA, and PROST, Circuit Judges.

Opinion for the court filed by Circuit Judge PROST.  Opinion dissenting in part filed by Circuit Judge MAYER.

PROST, Circuit Judge.

Macke International Trade, Inc. ("Macke") and Anthony O'Rourke appeal decisions of the United States District Court for the Central District of California granting judgment as a matter of law ("JMOL") that O'Rourke was personally liable for inducing Macke's infringement of U.S. Patent No. 5,636,592 ("the '592 patent") owned by Lawrence I. Wechsler, Wechsler v. Macke Int'l Trade, Inc., 232 F.R.D. 355 (C.D. Cal.

2005) ("Wechsler II"), and denying JMOL that the jury's award of lost profit damages to Wechsler for Macke's infringement of the '592 patent was not supported by substantial evidence. Wechsler v. Macke Int'l Trade, Inc., 399 F. Supp. 2d 1088 (C.D. Cal. 2005) ("Wechsler III"). Wechsler cross-appeals the district court's grant of summary judgment that Macke is not the alter ego of O'Rourke. Wechsler v. Macke Int'l Trade, Inc., 327 F. Supp. 2d 1139 (C.D. Cal. 2004) ("Wechsler I"). We reverse the district court's grant of JMOL that O'Rourke was personally liable for inducing infringement of the '592 patent and the district court's award of lost profit damages. We affirm the district court's grant of summary judgment that Macke is not the alter ego of O'Rourke.

## I. BACKGROUND

Anthony O'Rourke is the president, lone stockholder, and sole employee of Macke, a company O'Rourke formed in 1991 to develop, manufacture, and market pet products. In early 1998, O'Rourke and a co-inventor developed a portable device for carrying and dispensing water for a pet, and filed a patent application on the device shortly thereafter. In late 1998, Macke began distributing this device under the name "Handi-Drink."

In 1999, during the prosecution of his patent application on the Handi-Drink device, O'Rourke learned of the '592 patent, which had been issued to Wechsler in 1997. Rather than securing an opinion of counsel regarding the validity of the '592 patent, O'Rourke analyzed the '592 patent, the prior art, and his own device himself and formed a belief that the '592 patent was invalid and not infringed by the Handi-Drink device. Nonetheless, O'Rourke had counsel for Macke enter into licensing negotiations with Wechsler. These licensing negotiations broke down in August 1999 when

Wechsler filed suit against Macke and O'Rourke for infringement of the '592 patent. At that time, O'Rourke redesigned the Handi-Drink device. However, Macke kept the original Handi-Drink device on the market until April 2000.

On motions for summary judgment, the district court ruled that O'Rourke was not the alter ego of Macke and was not liable for infringement under 35 U.S.C. § 271(a). Wechsler I, 327 F. Supp. 2d at 1146. However, the district court ruled that there was a genuine issue of material fact as to when O'Rourke learned of the '592 patent and whether he possessed the personal culpability to be liable for inducing infringement under 35 U.S.C. § 271(b). Id. at 1148.

After a jury trial, the jury returned special verdicts finding that Macke and O'Rourke willfully infringed the '592 patent based on their becoming aware of the patent in April 1999 and continuing to sell the original Handi-Drink device until April 2000 ("Special Verdict No. 3"), but that O'Rourke was not personally liable for inducing Macke's infringement ("Special Verdict No. 1"). Wechsler II, 232 F.R.D. at 357. Nonetheless, the district court granted Wechsler's motion for JMOL that O'Rourke was personally liable for inducing infringement of the '592 patent, essentially reversing the jury's special verdict to the contrary. Id. at 360.

Having found that Macke and O'Rourke infringed the '592 patent, the jury awarded Wechsler approximately $630,000 in lost profits and approximately $25,000 in reasonable royalties for the infringement. Macke and O'Rourke moved for JMOL setting aside the lost profit damages since Wechsler did not manufacture a product until after the Handi-Drink device was off the market. That motion was denied by the district court. Wechsler III, 399 F. Supp. 2d at 1094.

This appeal followed. O'Rourke appeals the grant of JMOL that he is personally liable for inducing infringement of the '592 patent. Macke and O'Rourke appeal the denial of JMOL that the lost profit award was not supported by substantial evidence. Wechsler cross-appeals the grant of summary judgment that Macke is not O'Rourke's alter ego. We have jurisdiction over each pursuant to 28 U.S.C. § 1295(a)(1).

## II. DISCUSSION

### A. Grant of JMOL that O'Rourke was Personally Liable for Infringement

O'Rourke appeals the district court's grant of JMOL that he was personally liable, despite the jury's special verdict that he was not. In granting JMOL, the district court determined that Special Verdict No. 1, i.e., that O'Rourke was not personally liable for inducing infringement, was inconsistent with Special Verdict No. 3, i.e., that the defendants willfully infringed the '592 patent. However, in reconciling these two special verdicts, the district court essentially discarded Special Verdict No. 1. O'Rourke contends this was error.

This court "applies the same standard of review as that applied by the trial court when reviewing a JMOL motion following a jury verdict." nCube Corp. v. SeaChange Int'l, Inc., 436 F.3d 1317, 1319 (Fed. Cir. 2006). The grant or denial of JMOL is reviewed under the law of the regional circuit in which an appeal from the district court would normally lie. Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co., 425 F.3d 1366, 1372 (Fed. Cir. 2005). The regional circuit in this case is the Ninth Circuit, which reviews de novo an order granting or denying JMOL. See Acosta v. City & County of S.F., 83 F.3d 1143, 1145 (9th Cir. 1996) (grant); Rivero v. City & County of S.F., 316 F.3d 857, 863 (9th Cir. 2002) (denial). Under Ninth Circuit law, JMOL requires

that "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir. 2002).

With regard to allegedly inconsistent jury verdicts, we also apply regional circuit law. EMI Group N. Am., Inc. v. Cypress Semiconductor Corp., 268 F.3d 1342, 1348 (Fed. Cir. 2001). The Ninth Circuit "review[s] de novo a claim that the jury's verdict is inconsistent and decide[s] whether its responses can be harmonized." Affordable Hous. Dev. Corp. v. City of Fresno, 433 F.3d 1182, 1193 (9th Cir. 2006). "A trial court is rarely entitled to disregard jury verdicts that are supported by substantial evidence," Duk v. MGM Grand Hotel, Inc., 320 F.3d 1052, 1058 (9th Cir. 2003), and "cannot choose to ignore a legitimate finding that is part of the special verdict." Floyd v. Laws, 929 F.2d 1390, 1397 (9th Cir. 1991).

Here, the district court did not hold that Special Verdict No. 1 was not supported by substantial evidence. Instead, the district court held that two special verdicts returned by the jury were inconsistent. After the being instructed that "[t]he defendants are Macke International Trade, Inc. [a]nd Anthony O'Rourke, referred to respectively as 'Macke' and 'O'Rourke,'" the jury was asked:

> 1. Do you find that Mr. Wechsler has shown by a preponderance of the evidence that Mr. O'Rourke is personally liable for infringement of the ['592] patent?
>
> "YES" is a finding for Mr. Wechsler. "NO" is a finding for Mr. O'Rourke.
>
> * * *
>
> 3. Do you find by clear and convincing evidence that Defendants have willfully infringed based upon Defendants becoming aware of the content of the ['592] patent in April 1999 and then continuing to sell the original Handi-Drink?

> "YES" is a finding for Mr. Wechsler. "NO" is a finding for Mr. O'Rourke.

(emphases added). The jury answered "NO" to the former question and "YES" to the latter. In light of these responses, the district court "recognize[d] that an inconsistency may arguably exist in the special verdicts returned by the jury, and that the Court 'has a duty to reconcile the jury's special verdict responses on any reasonable theory consistent with the evidence.'" Wechsler II, 232 F.R.D. at 359 (quoting Pierce v. S. Pac. Transp. Co., 823 F.2d 1366, 1370 (9th Cir. 1987)).

In attempting to reconcile the verdicts, the district court essentially reversed the jury's finding on Special Verdict No. 1. However, the district court did not find that the verdict was not supported by substantial evidence. Instead, the district court stated that "the record fully supports and makes reasonable the conclusion that the jury intended to find O'Rourke personally liable for infringing the '592 patent . . . ." Wechsler II, 232 F.R.D. at 360. Were it to find Macke liable for willful infringement yet exonerate O'Rourke, the only person through whom Macke acted, the district court felt such a result "would be inconsistent and unreasonable because the record does not support any finding that Macke acted independently of O'Rourke." Id.

However, the district court's conclusion that the "record fully supports . . . that the jury intended to find O'Rourke personally liable" is in direct conflict with the jury's special verdict that Wechsler had not shown by a preponderance of the evidence that O'Rourke was personally liable for infringement of the '592 patent. Furthermore, the district court's statement that finding Macke liable for willful infringement while exonerating O'Rourke "would be inconsistent and unreasonable because the record does not support any finding that Macke acted independently of O'Rourke" is not only incorrect, it

disregards the grant of summary judgment that Macke was not the alter ego of O'Rourke.

Under the district court's logic, a person that incorporates him or herself to conduct business can never escape personal liability for willful infringement by the corporation. This is inconsistent with our case law. Unless the corporate structure is a sham, we have held that personal liability for inducement must be supported by personal culpability. Hoover Group, Inc. v. Custom Metalcraft, Inc., 84 F.3d 1408, 1412 (Fed. Cir. 1996). This requires the officer to have possessed a specific intent to "aid and abet" the infringement. Water Techs. Corp. v. Calco, Ltd., 850 F.2d 660, 668 (Fed. Cir. 1998). A primary consideration for willful infringement, on the other hand, is whether the infringer had a good faith belief that the patent was invalid and/or not infringed. SRI Intern., Inc. v. Advanced Tech. Labs., Inc., 127 F.3d 1462, 1464 (Fed. Cir. 1997). The two standards are not the same. For example, a corporate officer could negligently believe that a patent was invalid and/or not infringed. This might support a finding of willful infringement by the corporation, see Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc., 249 F.3d 1341, 1356 (Fed. Cir. 2001), but not a finding of personal liability for the officer. Accordingly, the district court's statement that finding Macke liable for willful infringement while exonerating O'Rourke would be "inconsistent and unreasonable" because Macke could not act independently of O'Rourke is clearly incorrect.

In fact, not only are the special verdicts not inconsistent, but giving meaning to both Special Verdicts Nos. 1 and 3 appears to be the most reasonable interpretation of them, given the instructions the district court gave to the jury. Before submitting the

issues to the jury, the district court described Wechsler's contentions to the jury as follows:

> First, Wechsler contends that <u>O'Rourke</u> is personally liable for indirect infringement of the '592 patent by contributing to or encouraging others to directly infringe.
> Second, Wechsler claims that he has suffered damages as a result of <u>Macke</u>'s infringement.
> Third, Wechsler claims that <u>Macke</u>'s infringement of the '592 patent is willful.

(emphases added). None of the jury instructions referenced O'Rourke directly infringing the '592 patent—the district court had already granted summary judgment that O'Rourke was not liable for direct infringement. <u>Wechsler I</u>, 327 F. Supp. 2d at 1146. The instructions of willful infringement only referred to Macke. In light of this, the most reasonable interpretation of the special verdicts is that the jury intended to find that Macke had willfully infringed the '592 patent, but that O'Rourke was not personally liable for Macke's infringement.

Thus, rather than disregarding the jury's explicit finding that O'Rourke was not personally liable for infringement of the '592 patent in Special Verdict No. 1, the district court should have interpreted the finding of willful infringement in Special Verdict No. 3 as extending only to Macke. This would have resolved any apparent inconsistency between the two special verdicts and been consistent with both the jury instructions that referred to willful infringement by Macke alone and the grant of summary judgment that Macke was not the alter ego of O'Rourke. Accordingly, the district court's grant of JMOL that O'Rourke was personally liable for infringement of the '592 patent was in error.

## B. Denial of JMOL Precluding Lost Profits

O'Rourke and Macke also appeal the district court's denial of JMOL that the jury's award of lost profit damages was not supported by substantial evidence. According to O'Rourke and Macke, lost profits should be unavailable to Wechsler as a matter of law since Wechsler lacked the ability to produce a product while the Handi-Drink device was on the market.

"Whether lost profits are legally compensable in a particular situation is a question of law that we review de novo." Poly-Am., L.P. v. GSE Lining Tech., Inc., 383 F.3d 1303, 1311 (Fed. Cir. 2004) (citing Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1544 (Fed. Cir. 1995) (en banc)). "To recover lost profits, the patent owner must show 'causation in fact,' establishing that 'but for' the infringement, he would have made additional profits." Grain Processing Corp. v. Am. Maize-Prods. Co., 185 F.3d 1341, 1349 (Fed. Cir. 1999) (citing King Instruments Corp. v. Perego, 65 F.3d 941, 952 (Fed. Cir. 1995)).

According to the district court, Wechsler "presented substantial evidence of such but-for causation in the form of evidence of his development and sales of [his product] and the testimony of his expert," and that "[t]he strength of that evidence was determined by the jury, and may not be reconsidered by the Court." Wechsler III, 399 F. Supp. 2d at 1088. The district court, however, is incorrect. Not only is the substantial evidence of this but-for causation lacking, the availability of lost profits is a question of law for the court, not the jury. Poly-Am., 383 F.3d at 1311. Only after the court has decided, as a matter of law, that lost profits are available does the jury then get to

determine the amount of those lost profits. Ericsson, Inc. v. Harris Corp., 353 F.3d 1369, 1373 (Fed. Cir. 2003).

"Normally, if the patentee is not selling a product, by definition there can be no lost profits." Rite-Hite, 56 F.3d at 1548. The only exception is where the patentee has the ability to manufacture and market a product, but for some legitimate reason does not. Even in these situations, though, "the burden on a patentee who has not begun to manufacture the patented product is commensurately heavy." Hebert v. Lisle Corp., 99 F.3d 1109, 1120 (Fed. Cir. 1996).

Here, it is undisputed that Wechsler did not produce a product until April 2001, approximately one year after the period of infringement ended. Nonetheless, Wechsler asserts that he had the capability to do so earlier, as evidenced by his later sales and the testimony of his expert. The evidence of later manufacturing and marketing, however, is not dispositive to the determination of whether the patentee had the ability to do so during the period of infringement. Only if it is indicative of the ability to manufacture and market the patented device during the period of infringement is it relevant.

In the present case, the record demonstrates that, despite his later success manufacturing and marketing a product, Wechsler lacked the capability to manufacture his device during the period of infringement. In a letter dated April 24, 2000, Wechsler wrote to his factory stating that he "was disappointed to learn . . . that a rough production sample [of his device would] not be available until early June [2000]." Not until August 2000, four months after the Handi-Drink device was taken off the market,

was Wechsler finally successful in producing his own device. As such, Wechsler clearly lacked the ability to manufacture his device during the period of infringement.

Wechsler's expert's testimony to the contrary does not change this fact. Wechsler's expert's opinion that Wechsler had the capability to manufacture and market his device during the period of infringement was based solely on the fact that Wechsler manufactured and marketed his product after the period of infringement. As stated by Wechsler's expert, "[w]e know Wechsler had the capacity to manufacture the product. As he described, he did manufacture the product at a later time." However, as discussed above, later success in manufacturing a product does not necessarily indicate the ability to manufacture it at an earlier date. Here, the evidence clearly demonstrates that Wechsler, due to delays at his factory, was unable to produce a product during the period of infringement.

Contrary to O'Rourke and Macke's contention, however, this does not end our inquiry. Wechsler could still receive lost profit damages if Macke's infringing sales preempted subsequent sales by Wechsler and/or eroded the market price Wechsler was able to charge for his product. See Lam, Inc. v. Johns-Manville Corp., 718 F.2d 1056, 1065 (Fed. Cir. 1983). The record below, however, lacks substantial evidence to support either theory. Instead, Wechsler and his expert presented little more than conclusory evidence on these theories. For example, Wechsler's expert testified that Wechsler "could have sold [his product] to those people who were desirous of . . . a product [like that sold by Macke]." The issue, however, is not whether Wechsler could have sold his product to those individuals; the issue is whether Wechsler would have sold his product to those individuals. Nothing in the record indicates that that would

have happened. Similarly, with regard to price erosion, Wechsler's expert testified as to the difference between the price Wechsler wanted to charge and the amount he actually charged for his product. However, nothing in the record links this price difference to Macke's earlier presence in the market. In fact, nothing in the record indicates that Wechsler ever attempted to sell his product at his originally intended price. Moreover, since Macke's and Wechsler's products were not on the market contemporaneously, there could not have been any direct price competition between the two. Without some evidence tying the lower price Wechsler received for his product to Macke's infringing sales or indicating that Macke's infringing sales preempted subsequent sales by Wechsler, the jury's award of lost profit damages was not supported by substantial evidence. The district court's denial of JMOL on the issue of lost profit damages was, therefore, in error.

### C. Summary Judgment on Alter Ego Liability

Wechsler cross-appeals the district court's grant of summary judgment that Macke was not the alter ego of O'Rourke. We review the grant of summary judgment de novo, drawing all reasonable factual inferences in favor of the non-moving party, in this case Wechsler. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). Only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law" is summary judgment appropriate. Fed. R. Civ. P. 56(c).

Since the alter ego issue is not unique to patent law, we apply the law of the regional circuit. Insituform Techs., Inc. v. CAT Contracting, Inc., 385 F.3d 1360, 1380 (Fed. Cir. 2004) (citing Panduit Corp. v. All States Plastic Mfg. Co., 744 F.2d 1564, 1574-75 (Fed. Cir. 1984)). The Ninth Circuit applies the law of the forum state, in this

case California, to determine whether a corporation is the alter ego of an individual. Towe Antique Ford Found. v. IRS, 999 F.2d 1387, 1391 (9th Cir. 1993).

California courts generally treat the alter ego doctrine as a drastic remedy and disregard the corporate form only reluctantly and cautiously. See, e.g., Las Palmas Assocs. v. Las Palmas Ctr. Assocs., 235 Cal. App. 3d 1220, 1249 (1991). Only when: (1) "there is such a unity of interest and ownership that the individuality, or separateness, of the said person and the corporation has ceased," and (2) "an adherence to the fiction of the separate existence of the corporation would . . . sanction a fraud or promote injustice" does California law recognize an alter ego relationship. Firstmark Capital Corp. v. Hempel Fin. Corp., 859 F.2d 92, 94 (9th Cir. 1988).

In arguing for piercing the corporate veil, Wechsler points out that O'Rourke is the sole shareholder, director, and officer of Macke. However, "the rule is well settled . . . that the mere fact [an individual] owns all of the stock of another corporation is not of itself sufficient to cause the courts to disregard the corporate entity of the . . . corporation and to treat it as the alter ego of the individual." Carlesimo v. Schwebel, 87 Cal. App. 2d 482, 491 (1948). "Bad faith in one form or another must be shown before the court may disregard the fiction of separate corporate existence." Id.

In an attempt to show such bad faith, Wechsler argues that: (1) Macke was undercapitalized, (2) O'Rourke concentrated assets in himself and liabilities in Macke, (3) O'Rourke treated Macke's assets as his own, (4) O'Rourke held himself out as liable for Macke's debts, and (5) O'Rourke intended to use the corporate identity to defraud creditors. However, Wechsler's allegations, taken either individually or collectively, fail to raise a genuine issue of material fact.

With regard to his argument that Macke is undercapitalized, Wechsler draws the court's attention to Macke's balance sheet. However, Macke's balance sheet shows that Macke had significant assets in a bank account, positive net income, and no liabilities. Moreover, Wechsler has submitted no evidence that Macke ever failed to pay its bills or other debts. At best, Wechsler merely points out that Macke does not carry patent infringement liability insurance. Wechsler, however, does not demonstrate how this fact makes Macke undercapitalized. California law is clear that "it is incumbent upon the one seeking to pierce the corporate veil to show by evidence that the financial setup of the corporation is just a sham, and accomplishes injustice." Id. at 493. As such, Wechsler's argument—that Macke's failure to show that it had sufficient capitalization to pay an adverse judgment without such insurance raises a material issue of fact—misses this point. Macke had no duty to make such a showing. Instead, Wechsler had the burden of demonstrating that Macke was insufficiently capitalized to pay an adverse judgment without such insurance, and failed to do so. As such, Wechsler failed to raise a material issue of fact as to whether Macke was sufficiently capitalized.

With regard to the allegation that O'Rourke held himself out as personally liable for Macke's debts, Wechsler cites letters from the attorney for both O'Rourke and Macke to two of Macke's customers offering to indemnify them in any potential patent infringement suit brought by Wechsler. These letters, however, do not specifically identify O'Rourke as the indemnitor. Instead, they identify the attorney's "client," which may refer to either O'Rourke or Macke, as the indemnitor. According to O'Rourke, this was intended to identify Macke, not him. However, even if O'Rourke did offer to

personally indemnify Macke's customers, such an indemnification would make him liable for the customers' debts, not Macke's. As such, Wechsler's argument that O'Rourke held himself out as liable for Macke's debts is misguided.

Wechsler's contention that O'Rourke manipulated corporate assets and liabilities so as to concentrate assets in himself and liabilities in the corporation is also off the mark. Wechsler bases this assertion on the fact that O'Rourke licensed, rather than assigned, his patents to Macke and that these licenses would terminate if Macke ever became insolvent. These, however, are common licensing terms, see Richard Levin & Glenn Walter, Bankruptcy and Licensing, 786 PLI/Pat 757, 765 (June 2004), and do not raise an issue of material fact as to whether O'Rourke and Macke are alter egos. Moreover, the argument that O'Rourke concentrated liabilities in the corporation is at odds with Wechsler's previous argument that O'Rourke held himself out as personally liable for the corporation's debts.

Wechsler's contention that O'Rourke treated Macke's assets as his own also falls short of raising a genuine issue of material fact. In support of his argument, Wechsler relies on the fact that two of Macke's websites referred to Macke's PETCREW® product line as "Anthony O'Rourke's Petcrew." However, this evidence does not establish that O'Rourke used corporate assets for his own benefit. To the contrary, by attaching O'Rourke's name to Macke's mark, Macke was the one being benefited—by taking advantage of O'Rourke's reputation in the pet product industry.

Lastly, Wechsler's contention that O'Rourke intended to use the corporate identity to defraud creditors also fails to raise an issue of material fact. According to Wechsler, during settlement negotiations, counsel for Macke and O'Rourke alluded to

"reconfiguring [Macke] in anticipation of any adverse decision" in this case.[1]  Wechsler took this as a veiled threat to reconfigure Macke so as to deprive Wechsler a full recovery in the event of an adverse decision.  However, Wechsler presented no evidence that O'Rourke actually took steps to reconfigure the corporation.  Absent such affirmative steps, a mere allusion to "reconfiguring" the corporation made in the course settlement negotiations fails to indicate an intent to defraud creditors.

In short, none of these facts raise a genuine issue as to any material fact, even when considered collectively and when drawing all inferences in favor of Wechsler.  Without any evidence that actually supports Wechsler's allegations, no reasonable jury could have found that Macke was the alter ego of O'Rourke.  Accordingly, the district court correctly granted summary judgment that Macke is not the alter ego of O'Rourke.

## III. CONCLUSION

Because the district court improperly disregarded the jury's special verdict, the district court's grant of JMOL that O'Rourke was personally liable for inducing infringement by Macke is reversed.  Because the jury's award of lost profit damages was not supported by substantial evidence, the district court's denial of JMOL on the issue of lost profits is also reversed.  Lastly, because the district court correctly concluded that Wechsler had failed to raise an issue of material fact regarding alter ego

---

[1]     Macke and O'Rourke contend that the letter containing this allusion to "reconfiguring [Macke] in anticipation of any adverse decision" is inadmissible under Fed. R. Evid. 408, which prohibits the use of certain evidence "when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction."  The district court appears to have held otherwise. See Wechsler I, 327 F. Supp. 2d at 1144, n.4.  Regardless, the admissibility of the letter does not change the result of our analysis.

05-1242, -1243                              16

liability, the district court's grant of summary judgment that Macke is not the alter ego of O'Rourke is affirmed.

COSTS

No costs.

<u>REVERSED-IN-PART AND AFFIRMED-IN-PART</u>

# United States Court of Appeals for the Federal Circuit

05-1242, -1243

LAWRENCE I. WECHSLER,

Plaintiff-Cross Appellant,

v.

MACKE INTERNATIONAL TRADE, INC.,

Defendant-Appellant,

and

ANTHONY O'ROURKE,

Defendant-Appellant.

MAYER, Circuit Judge, dissenting-in-part.

Because Wechsler has presented a valid legal theory founded on factual conclusions supported by substantial evidence, I dissent from the court's reversal of the jury's lost profits award.

"To recover lost profits damages, the patentee must show a reasonable probability that, 'but for' the infringement, it would have made the sales that were made by the infringer." Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1545 (Fed. Cir. 1995) (en banc) (citations omitted); see also Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 507 (1964). Determining if lost profits are compensable is a legal question. Poly-Am., L.P. v. GSE Lining Tech., Inc., 383 F.3d 1303, 1311 (Fed. Cir. 2004). However, once we have determined that a viable legal theory exists, we must

assume the evidentiary facts were resolved in a way to support the jury's verdict, and our review is limited to whether those inferred factual findings are supported by substantial evidence. Hebert v. Lisle Corp., 99 F.3d 1109, 1114-15 (Fed. Cir. 1996).

Here, Wechsler's theory is premised upon diverted sales and price erosion, that Macke International Trade, Inc.'s ("Macke") infringing sales displaced his ability to make those sales when he subsequently entered the market, and Macke's lower-priced infringing goods eroded his ability to charge otherwise attainable higher prices. It is uncontested that Wechsler was not selling a competing product during the infringement period, but he was making preparations to enter the market during that period and then did enter the market less than a year later. As a matter of law, this is sufficient to entitle a patent owner to lost profits if proven. Cf. Rite-Hite Corp., 56 F.3d at 1545.

Macke's contention that a patent owner must be selling a competing product during the infringement period to recover lost profits is incorrect. Indeed, we previously have rejected such a contention. See Hebert, 99 F.3d at 1119-20. Instead, we recognized that valid legal theories may exist in which profits were lost despite the patentee not having a competing product on the market, and we concluded that it was for the trier of fact to determine whether any such theory was sufficiently proven. Id. ("Although it would be incorrect to bar a patentee who is not yet manufacturing the product from proving that its actual damages were larger than a reasonable royalty, the burden on a patentee who has not begun to manufacture the patented product is commensurately heavy." (citation omitted)).

Moreover, logic dictates that a patentee may still suffer lost profits despite an inability to manufacture during the infringement period. As Wechsler argues here,

subsequent sales by the patentee may be preempted by the earlier infringing sales and those earlier infringing sales may also erode the market price. Accordingly, because Wechsler's absence from the market and inability to enter the market during the infringement period is not a per se bar to recovering lost profits, our review is reduced to whether the jury's presumed factual findings are supported by substantial evidence.

The jury was presented with expert testimony that Wechsler could have sold every infringing unit sold by Macke but for the infringement. The expert's conclusion was premised on the lack of a suitable noninfringing alternative product and demand for the patented product. On appeal, Macke contends that its noninfringing product (the Handi-Drink 2), which was developed nearly one year after the current suit was filed, was a suitable alternative. Determining whether a noninfringing alternative was available during the infringement period and whether it was suitable are factual issues. See Grain Processing Corp. v. Am. Maize-Prods. Co., 185 F.3d 1341, 1354 (Fed. Cir. 1999). It is true that a noninfringing alternative need not be on the market during the infringement period to factor into a lost profits analysis. E.g., id. at 1349-55. However, "[w]hen an alleged alternative is not on the market during the accounting period, a trial court may reasonably infer that it was not available as a noninfringing substitute at that time." Id. at 1353 (citation omitted). The burden then falls on the infringer to prove availability, and the fact-finder "must proceed with caution" in assessing such proof. Id.

Here, Anthony O'Rourke, Macke's president, testified that it took nearly one year to develop the Handi-Drink 2 and bring it to market. This testimony supports the jury's presumed finding that it was not available during the infringing period. See Micro Chem., Inc. v. Lextron, Inc., 318 F.3d 1119, 1123 (Fed. Cir. 2003) (noting the efforts

05-1242, -1243                                    3

required to bring a product to market in concluding it was not available during the infringement period). In addition, the jury's presumed finding that the Handi-Drink 2 is not a suitable alternative is supported by testimony that it lacked key features and the functionality of Wechsler's product. TWM Mfg. Co. v. Dura Corp., 789 F.2d 895, 901 (Fed. Cir. 1986) ("A product lacking the advantages of that patented can hardly be termed a substitute 'acceptable' to the customer who wants those advantages." (quoting Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1162 (6th Cir. 1978)). With evidence of demand for the product and no suitable alternative, the jury was free to reasonably conclude that Wechsler would have made the sales made by the infringer.

Finally, Macke contends that Wechsler failed to prove the amount of damages he suffered. However, the jury was presented evidence on the amount of damages, including the pricing of similar goods on the market, the lack of suitable alternatives, Wechsler's manufacturing costs, price erosion, and expert testimony concerning the calculation of damages. The jury presumably found this evidence credible. Accordingly, in light of the absence of proof a suitable alternative, it was free to conclude that Wechsler would have made all of the sales made by Macke. See State Indus., Inc. v Mor-Flo Indus., Inc., 883 F.2d 1573, 1578 (Fed. Cir. 1989). Bearing in mind that "the patent owner's burden of proof is not an absolute one, but rather a burden of reasonable probability," Lam, Inc. v. Johns-Manville Corp., 718 F.2d 1056, 1065 (Fed. Cir. 1983), and that "when the amount of the damages cannot be ascertained with precision, any doubts regarding the amount must be resolved against the infringer," id., substantial evidence supports the jury's determination of the damages amount. I would affirm the jury's award of lost profits.